IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LISA C.,                       )
                               )
    **Plaintiff,**          )
                               )    **No. 20-cv-5173**
    **v.**                  )
                               )    **Magistrate Judge Jeffrey I. Cummings**
**KILOLO KIJAKAZI,**[1]       )
**Commissioner of Social Security,**   )
                               )
    **Defendant.**        )

## MEMORANDUM OPINION AND ORDER

Lisa C. ("Claimant") brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIBs") and Supplemental Security Income ("SSI"). The Commissioner brings a cross-motion for summary judgment seeking to uphold the prior decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons that follow, Claimant's motion to reverse the decision of the Commissioner, (Dckt. #18), is denied and the Commissioner's motion to uphold the decision to deny benefits, (Dckt. #25), is granted. The decision of the ALJ is affirmed.

## I.    BACKGROUND

### A.    Procedural History

On September 7, 2017, Claimant (then 27-years old) filed applications for DIBs and SSI alleging disability dating back to May 19, 2016, due to limitations stemming from Crohn's

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by her first name and the first initial of her last name. Acting Commissioner of Social Security Kilolo Kijakazi has also been substituted as the named defendant. Fed.R.Civ.P. 25(d).

disease and arthritis. (Administrative Record ("R.") 4, 74). Claimant's date last insured was June 30, 2021. (R. 16). Her applications were denied initially and upon reconsideration. Claimant filed a timely request for a hearing, which was held on September 4, 2019, before Administrative Law Judge ("ALJ") Jessica Inouye. (R. 28-73). Claimant appeared with counsel and offered testimony, as did a Vocational Expert. On September 26, 2019, the ALJ issued a written decision denying Claimant's applications for benefits. (R. 14-23). Claimant filed a timely request for review with the Appeals Council. On June 30, 2020, the Appeals Council denied Claimant's request for review, leaving the decision of the ALJ as the final decision of the Commissioner. (R. 1-6). This action followed.

**B.      The Social Security Administration Standard to Recover Benefits**

To qualify for disability benefits, a claimant must demonstrate that she is disabled, meaning she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). At step two, the SSA determines whether a claimant has one or more medically determinable physical or mental impairments. 20 C.F.R. §404.1521. An impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* In other words, a physical

2

or mental impairment "must be established by objective medical evidence from an acceptable medical source." *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at *2 (N.D.Ind. Oct. 22, 2019). If a claimant establishes that she has one or more physical or mental impairments, the ALJ then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, she is considered disabled and no further analysis is required. If the listing is not met, the analysis proceeds. 20 C.F.R. §404.1520(a)(4)(iii).

Before turning to the fourth step, the SSA must assess the claimant's residual functional capacity ("RFC"), or her capacity to work in light of the identified impairments. Then, at step four, the SSA determines whether the claimant is able to engage in any of her past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, she is not disabled. *Id.* If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform given her RFC, age, education, and work experience. If such jobs exist, she is not disabled. 20 C.F.R. §404.1520(a)(4)(v).

### C.    The Evidence Presented to the ALJ

Again, Claimant seeks DIBs and SSI due to limitations from Crohn's disease and arthritis. The administrative record contains the following evidence that bears on her claim:

3

### 1. Evidence from Claimant's Medical Record

### a. Treating Gastroenterologist Dr. Kirch

Claimant has been under the care of gastroenterologist Everett Kirch, M.D. since 2010 for the treatment of her Crohn's disease. (R. 764, 783). Claimant underwent a successful bowel resection of the small bowel in 2014. (R. 789-90).

From 2016 through 2019, Claimant saw Dr. Kirch for management of her Crohn's disease approximately every two to four months. In February 2016, a few months prior to her alleged onset of disability (May 19, 2016), Claimant reported no "alarm[ing]" symptoms and was working full time. (R. 345.) She was taking Humira and mercaptopurine ("6-MP") as prescribed by her rheumatologist, Dr. Kenneth Margules. (*Id*.).

Claimant returned to see Dr. Kirch in August 2016, complaining of a recent increase in abdominal pain, though she told Dr. Kirch she was "doing okay from her [C]rohn's." (R. 341). Claimant further reported that Dr. Margules told her to be "off work so she lost her job." (*Id*.). Dr. Kirch reviewed a recent CT, which showed a large ovarian cyst and mild inflammatory bowel changes. (*Id*.; R. 349-50). His review of systems with Claimant was positive for abdominal pain, diarrhea, bloating, and back and joint pain. (R. 342). A physical exam was normal, and Dr. Kirch planned to re-check Claimant's labs. (R. 341-43).

A few months later, in November 2016, Claimant complained of diarrhea ten times a day, along with abdominal pain, and back and joint pain. (R. 337-38). Dr. Kirch increased Claimant's dosage of 6-MP, recommended a probiotic, and referred Claimant for a colonoscopy. (R. 337, 339). By January 2017, Claimant – then newly pregnant – continued to complain of some irregular diarrhea depending on her diet, (R. 333), but by the following month, Dr. Kirch commented she had "no problems" and no "gi [symptoms]." (R. 329). In March 2017, Claimant

4

again reported no "gi [symptoms]," (R. 325), and in April 2017, Dr. Kirch documented "no [C]rohn's [symptoms]." (R. 321). In June 2017, although Dr. Kirch's review of symptoms was positive for diarrhea, back pain, and numbness, he reported that Claimant was "doing great." (R. 317-18).

By August 2017, Claimant had delivered her baby and had recently been treated for kidney stones and a UTI at the local emergency department. (R. 313, 612, 572). She reported diarrhea upon review of systems, and Dr. Kirch continued her on Humira and 6-MP. (R. 313-14). Claimant returned to see Dr. Kirch in November 2017 and explained that while she was "developing arthritis," her Crohn's was "still stable." (R. 425). In February 2018, Dr. Kirch noted abdominal cramping and joint pain, and scheduled a colonoscopy, which ultimately revealed "minimal/mild" disease. (R. 429, 774, 779-80).

Claimant did not return to see Dr. Kirch until a year later in March 2019. (R. 774). She reported "no gi symptoms on [H]umira." (*Id.*). In July 2019, just a few weeks before Claimant's administrative hearing, Dr. Kirch described Claimant's Crohn's symptoms as "minimal . . . by and large" and commented that her recent labs were normal. (R. 770).

### b.    Treating Rheumatologist Dr. Robert Hozman

Claimant began treatment with rheumatologist Dr. Robert Hozman in October 2017. At her initial consultation, Claimant reported abdominal pain, diarrhea, and general joint pain – predominately in the right wrist – which she rated a 4 out of 10. (R. 389). On exam, Claimant exhibited tenderness of the lower spine and the upper and lower extremities, but Dr. Hozman observed full strength and full range of motion throughout. (R. 390). Dr. Hozman assessed Crohn's disease "without complication," inflammatory polyarthropathy, and ordered labs and imaging. (R. 391). At a follow-up appointment a month later, Dr. Hozman reviewed the x-rays

5

of Claimant's knees, hands, wrists, and lower spine, all of which were unremarkable. (R. 395, 543-44). Claimant continued to complain of right wrist pain and tenderness, and Dr. Hozman started her on Cymbalta. (R. 395-96).

Claimant returned to see Dr. Hozman every four months through mid-2018. (R. 755-62). Although she complained of intermittent swelling of her fingers, fatigue, and headaches, she reported an overall improvement of her joints with Cymbalta and Humira. (R. 755). In March 2018, Claimant described some "rare abdominal pains . . . that are short lived." (*Id.*). She continued to exhibit joint tenderness, but with full strength and range of motion, and Dr. Hozman added fibromyalgia to his assessment. (R. 756, 762). Claimant had no new complaints in June 2018 and described joint pain in her hands and feet at a 5/10. (R. 761). She was not in physical therapy at that time. (*Id.*).

### c. Emergency Room Records

During the relevant time period, Claimant periodically sought treatment at the local Emergency Room for various conditions and symptoms, including for: stomach pain and joint pain in April 2016, (R. 699, 713); nausea, vomiting, and diarrhea in May 2016, (R. 666); lower back pain in August 2017, (R. 609); and facial cellulitis in early 2018. (R. 465). During the April 2016 ER visit, the examining physician noted a restricted range of motion and swelling in the left hand. (R. 701). During the May 2016 visit, Claimant reported that her Crohn's was "well controlled" with medication, and she had "not had problems . . . in 2 years." (R. 666).

### 2. Opinion from Claimant's Treating Physician

On March 7, 2019, Dr. Kirch completed a Crohn's & Colitis Medical Source Statement on behalf of Claimant. In it, he explained that Claimant suffers from, *inter alia*, chronic and bloody diarrhea, abdominal pain and cramping, nausea, and fatigue. (R. 764). According to Dr.

Kirch, when Claimant experiences a "flare-up" – the timing of which is unpredictable – she could sit for less than two hours a day, stand/walk for less than two hours a day, and would require three to six bathroom breaks a day, lasting up to 15 minutes at a time.  (R. 765-66).  Dr. Kirch added that Claimant would need to work near a bathroom during a flare up.  (R. 768).  Dr. Kirch further opined that Claimant would need to lie down one to three times a week due to her abdominal pain and would be absent about four days per month.  (R. 766-67).  According to Dr. Kirch, Claimant could frequently lift 0-10 pounds, occasionally 20 pounds, and rarely 50 pounds, and would have unspecified limitations in using her fingers during flare ups.  (*Id.*).  Notwithstanding the above, when specifically asked to identify the clinical findings and objective signs, Dr. Kirch answered that Claimant was: "stable on Humira and 6-MP" and that her "colonoscopy showed minimal disease."  (R. 764).

### 3.    Opinions from State Agency Consultants

On February 10, 2018, Claimant underwent a consultative examination with Julia Kogan, M.D.  Claimant described a history of Crohn's disease, and complained of frequent bowel movements, an inability to stand for more than 30 minutes at a time due to joint pain, and limitations in bending.  (R. 410).  Claimant told Dr. Kogan that she has difficulty with cleaning, washing dishes, and cooking.  (*Id.*).

Dr. Kogan's physical examination revealed primarily normal results.  (R. 411-17).  Claimant could ambulate fifty feet independently with a normal gait, straight leg testing was negative bilaterally, and Claimant exhibited a normal range of motion throughout.  (R. 412-17).  Dr. Kogan documented normal grip strength bilaterally, with no limitations in fine finger manipulations.  (R. 416.)  Dr. Kogan assessed Crohn's disease and ultimately opined that

Claimant had no difficulty in standing, bending, sitting, lifting, carrying, speech, gait, fine manipulation, or handling small objects. (R. 417).

James Hinchen, M.D., reviewed Claimant's file on February 14, 2019. He assessed "Other and Unspecified Arthropathies" and "Inflammatory Bowel Disease" as medically determinable impairments, but concluded they were non-severe because they did not significantly limit Claimant's physical or mental ability to do basic work activities. (R. 78-79, 86). Accordingly, Dr. Hinchen assessed no work limitations. Lisa Green-Hill, D.O., reviewed Claimant's file at the reconsideration level on June 18, 2018, and confirmed Dr. Hinchen's finding that Claimant's impairments were non-severe and required no limitations. (R. 100, 113). In reaching their conclusions, Drs. Hinchen and Green-Hill relied on Dr. Kogan's findings at the consultative examination. (R. 78-79, 100-01.)

### 4. Claimant's Hearing Testimony

Claimant appeared with counsel at the September 4, 2019 hearing before the ALJ. Upon questioning by the ALJ, Claimant testified that she stopped working in 2016 because her swollen and inflamed joints (particularly her fingers), stomach pains, and constant bathroom breaks (five to six times a day) were interfering with her job duties as a light fixture assembler. (R. 33-36, 40, 51-52). According to Claimant, she requested a workstation close to the restroom, but her employer informed her that if she kept leaving her station, she would be terminated. (R. 33, 35). It was at that time that she began to see Dr. Margules, who told her she would not be able to work. (R. 33). Claimant went on short term disability and was terminated when she did not return to work. (R. 33, 40).

At the time of the hearing, Claimant testified that she continues to use the bathroom frequently (four to six times a day for five to fifteen minutes at a time) "no matter what [she]

8

eats" and even when she is compliant with her medications. (R. 35-37, 53). She regularly experiences stomach cramping when she needs to use the bathroom and occasionally has bloody stools. (R. 38-39). Claimant suffers from nausea a "couple times a month" and has occasional dizziness when dehydrated. (R. 53, 59). Claimant takes Humira and 6-MP for her Crohn's symptoms and denied specific side effects from her medications. (R. 39-40, 55-56). Claimant further testified that she suffers more "flares" and diarrhea during the winter, and that her GI symptoms decreased when she was pregnant. (R. 45, 48).

When asked about her joint pain, Claimant testified that she continues to experience pain in her hands, ankles, and lower back – again, mostly "in the winter seasons when it's cold," – which remains "mild" if she does not do any significant activity. (R. 41). Claimant also experiences occasional wrist pain, and swelling in her fingers, also worse in the winter, and "not as bad" when it's warmer. (R. 57, 59). Claimant explained that her physicians told her she has "Crohn's disease with arthritis now," and that Dr. Hozman diagnosed fibromyalgia. (R. 41, 57.)

To treat her joint pain, Dr. Hozman prescribed Cymbalta, but Claimant stopped taking it after two months because it did not relieve her pain. (R. 42.) Claimant continues to treat her joint pain with Tylenol, baths, and lying down, (R. 44), and also underwent three months of physical therapy in 2018. (R. 41-42, 44). Claimant confirmed that she has not seen an orthopedist or podiatrist for her back and ankle pain. (R. 44). When asked why she had not returned to see Dr. Hozman in over a year, Claimant testified that it was an "inconvenience" to find a ride and sit in the waiting room for over half an hour, just to feel rushed during the appointment itself. (R. 46).

As for limitations on her daily activities, Claimant testified that she cannot do "daily cleanings," hold her daughter for more than a few minutes at a time, or go on walks longer than

9

ten minutes due to her "excruciating pains" in her ankles and back. (R. 42-43). According to Claimant, since 2016, she has had constant help during the day from either her brother-in-law or fiancé and she is "never alone with [her] daughter during the day." (R. 46-47). When asked by the ALJ why Claimant's prior reports – which seemed to imply she was a full-time caregiver for her children – did not include any reference to the help she receives from her family members, Claimant simply responded, "I'm not sure why not." (R. 47-48).

Finally, upon questioning by her attorney, Claimant opined that Dr. Kirch's treatment records likely indicated that she had "no changes in bowel habits," because Dr. Kirch was already aware of her daily diarrhea symptoms; "nobody wants to discuss their bowel issues;" and she wanted to avoid further invasive testing such as colonoscopies or endoscopies. (R. 54-55).

### 5. Vocational Expert's Hearing Testimony

After classifying Claimant's past relevant work, the ALJ asked the VE to consider a hypothetical individual of claimant's age, education, and work experience, who could perform light work, but could never climb ladders, ropes or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; should avoid hazards such as unprotected heights, moving dangerous machinery, and extreme cold. (R. 63). The VE explained that such an individual could not perform Claimant's past work as a production line assembler, or as a fast-food manager as she performed that job, but could work as a fast-food manager as generally performed in the national economy. (*Id.*). If the individual was limited to sedentary work, she could not perform Claimant's past work even as performed in the national economy, but could work in the representative unskilled, sedentary positions of food and beverage order clerk (160,000 jobs nationally), assembler (200,000 jobs), or bonder, semi-conductor (180,000 jobs). (R. 63-64).

Next, the ALJ added that the individual could only frequently use her hands for gross manipulation, grasping, fingering, or feeling. (R. 64). The VE explained that this limitation would eliminate the assembler position. (*Id*.). The VE further testified that a limitation to only occasional bilateral hand use would eliminate all unskilled, sedentary work. (R. 65).

The VE went on to explain that based on her experience and training, employers expect employees to be on task 85% of the workday, and permit two 15-minute breaks, and one 30-minute mid-shift meal break. (R. 65-66). According to the VE, additional bathroom breaks beyond those permitted would generally be viewed as an interruption to production and would be work-preclusive. (R. 66). Similarly, an employee who was away from her workstation and/or off-task for more than 15% of the workday would be precluded from working. (R. 66-67). The VE testified further that, generally speaking, employers allow 10-12 absences per year. (R. 68).

Upon questioning by Claimant's counsel, the VE testified that employees have no control over whether their workstation is located near a bathroom, and a request for re-location would likely be viewed differently – whether acceptable or unacceptable – depending on the employer. (R. 70-71). The VE elaborated that an employee's ability to work in close proximity to a bathroom is highly dependent on the type of facility (e.g., age of facility, layout, food vs. non-food facility, etc.). The VE explained that she would have no way of making a valid judgment as to the number of jobs in the national economy that are in close proximity to a bathroom. (R. 71).

### D. The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching her decision to deny Claimant's request for benefits. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset date of May 19, 2016. (R. 16). At step two, the ALJ determined that Claimant suffered from the severe impairment of Crohn's disease. (R.

11

17).  The ALJ considered Claimant's obesity and other "isolated conditions," such as cellulitis, urinary tract infection, dental pain, and ovarian cyst, but determined they were not severe.  (*Id.*). The ALJ also considered whether Claimant's "inflamed polyarthropathy/arthralgia/fibromyalgia" was a medically determinable impairment, consistent with Social Security Ruling ("SSR") 12-2p, "Evaluation of Fibromyalgia, 2012 WL 3104869 (S.S.A. July 25, 2012) (requiring a diagnosis from a medically acceptable source with documented evidence consistent with the diagnosis).  However, the ALJ determined that the objective record showed insufficient evidence to establish that Claimant's fibromyalgia was severe.[2]

At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments, including Listing 5.06 (inflammatory bowel disease).  (R. 17-18).  Before turning to step four, the ALJ determined that Claimant has the RFC to perform sedentary work,[3] except that she can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and should avoid hazards such as unprotected heights, moving dangerous machinery, and extreme cold.  (R. 18-21).  Based on this conclusion, the ALJ determined at step four that Claimant could not perform any of her past relevant work as a fast-food manager.  (R. 21).

---

[2] Specifically, the ALJ determined that: (1) there was insufficient evidence of detailed tender point exams; (2) Claimant's complaints of precise fibromyalgia symptoms were "scattered and inconsistent;" (3) there was a lack of neuropsychological workup; and (4) there was an overall lack of fibromyalgia work up to show that other disorders were ruled out.  (R. 17).

[3] "Sedentary work involves lifting no more than 10 pounds a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §404.1567(a).

Even so, at step five, the ALJ concluded that a sufficient number of jobs existed in the national economy that Claimant could perform given her age, education, work experience, and RFC, including the representative sedentary jobs of food and beverage order clerk, assembler, and bonder, semi-conductor. (R. 22). As such, the ALJ found that Claimant was not disabled from her alleged onset date through the date of her decision. (R. 22-23).

## II.      STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and be free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's

ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413.

## III. ANALYSIS

Claimant raises two main arguments in support of remand, specifically that: (1) the ALJ failed to properly assess her RFC; and (2) the ALJ's assessment of her subjective complaints was patently wrong. For the reasons that follow, the Court disagrees.

### A. The ALJ's RFC assessment is supported by substantial evidence.

The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014); *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (The RFC "is the most an individual can work despite his or her limitations or restrictions."). The task of assessing a claimant's RFC is reserved to the Commissioner. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

As the Seventh Circuit has made clear:

The relevant regulation, SSR 96-8p, lists seven strength functions that an ALJ must consider when assessing a claimant's RFC to work: lifting, carrying, sitting, standing, walking, pushing, and pulling. The regulation also requires an ALJ to describe 'how the evidence supports each conclusion [about a strength function], citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'

*Jarnutowski*, 48 F.4th at 774, *quoting* SSR 96-8p, 1996 WL 362207, at 34478. An ALJ's failure to comply with SSR 96-8p's requirements is a sufficient basis, by itself, for [a court] to reverse an ALJ's decision." *Id.*; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). Nonetheless, a court "may affirm an ALJ's decision that does not conform with SSR 96-8p's

requirements if [the court is] satisfied that the ALJ 'buil[t] an accurate and logical bridge from the evidence to her conclusion.'" *Jarnutowski,* 48 F.4th at 774, *quoting Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018). In other words, an ALJ's RFC analysis "must say enough to enable review of whether the ALJ considered the totality of a claimant's limitations." *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021).

As explained above, *supra* at section I.D., the ALJ here determined that Claimant maintained the RFC to perform sedentary work, except that she can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and should avoid hazards such as unprotected heights, moving dangerous machinery, and extreme cold. (R. 18-21). Claimant now argues that this RFC assessment was flawed because: (1) it was based on an "evidentiary deficit;" (2) the ALJ failed to include any limitations related to her Crohn's disease, particularly her need for excessive bathroom breaks during the workday; and (3) the ALJ failed to include any limitations on finger manipulation. The Court disagrees on all counts. !

### 1. The ALJ's RFC assessment was not based on an evidentiary deficit.

At the outset, the Court quickly disposes of Claimant's argument that the ALJ's RFC assessment was improperly based on an evidentiary deficit. As Claimant correctly notes, a reversible error may occur where the ALJ: "(1) creates an 'evidentiary deficit' by rejecting every expert opinion in the record and then (2) fills that deficit with her own interpretation of medical evidence." *Alvin S. v. Kijakazi*, No. 21-CV-3781, 2023 WL 2499860, at *4 (N.D.Ill. Mar. 14, 2023) (citing *Suide v. Astrue*, 371 Fed.Appx. 684, 689-90 (7th Cir. 2010) (an evidentiary deficit occurs when the ALJ rejects all physician opinion evidence)). But that is simply not what transpired here.

15

Instead, after reviewing Claimant's complaints along with the primarily unremarkable objective medical record, the ALJ turned to assessing the opinions of the state agency physicians and treating physician Dr. Kirch. Specifically, the ALJ found the opinions of state agency physicians Drs. Kogan, Hinchen and Green-Hill – who found no limitations – to be "persuasive," and the opinion of Dr. Kirch – who found extreme limitations – to be "unpersuasive," and provided supportive reasons for doing so.[4] (R. 20). Nonetheless, based on the ALJ's review of the record, including Claimant's own subjective complaints, the ALJ found that she "was more limited than determined by the State agency consultants" and included additional limitations in the RFC. (*Id*.). Thus, contrary to Claimant's assertion, the ALJ "*partially* relied on the expert medical opinions [and] [s]he did not ignore them completely." *Karla J.B. v. Saul*, No. 19 CV 50019, 2020 WL 3050220, at *5 (N.D.Ill. June 8, 2020) (emphasis added). Accordingly, the Court finds that no evidentiary deficit was created here. *Id.*; *McReynolds v. Berryhill*, 341 F.Supp.3d 869, 881 (N.D.Ill. 2018) (finding "no evidentiary deficit" where the ALJ partially relied on agency consultants' opinions but incorporated additional limitations).

### 2. The ALJ's decision not to include limitations related to bathroom breaks in the RFC was supported by substantial evidence.

Next, Claimant argues that the ALJ failed to include any limitations in her RFC stemming from her severe impairment of Crohn's disease, specifically her purported need to take four to six bathroom breaks a day for five to fifteen minutes at a time. (R. 35-37, 53). On the

---

[4] As the Commissioner points out, Claimant has not argued on appeal that the ALJ improperly assessed the extremely limiting opinion of her treating physician, Dr. Kirch. Had she done so, Claimant would have faced an uphill battle given the inconsistency between Dr. Kirch's opinion and his contemporaneous medical records, which repeatedly documented no significant Crohn's related symptoms. *See Bethany G. v. Kijakazi*, No. 20-CV-50483, 2023 WL 2683501, at *3 (N.D.Ill. Mar. 29, 2023) ("For claims filed on or after March 27, 2017 . . . supportability and consistency are the two most important [factors] for the ALJ to consider" when assessing the opinion of a treating physician.").

instant record, the Court disagrees and finds that the ALJ's decision not to include any limitations related to bathroom breaks to be supported by substantial evidence.

As Claimant notes, courts have found reversible error where an ALJ "fails to account for any bathroom breaks [a claimant] would need" during the workday. *Jacob D. v. Kijakazi*, No. 20-CV-0554, 2021 WL 3674610, at *3 (N.D.Ill. Aug. 19, 2021) (collecting cases); *see also Sikorski v. Berryhill*, 690 Fed.Appx. 429, 430 (7th Cir. 2017) (finding reversible error where "the ALJ did not make sufficient factual findings about the length of time that [claimant], who struggled with diarrhea as a result of her Crohn's disease, needed for bathroom visits."). But this matter is distinguishable from those cases relied on by Claimant in one significant regard; the record as a whole supports the ALJ's decision not to credit Claimant's allegations of her need for frequent bathroom breaks.

First, with respect to the objective medical records, apart from one complaint of diarrhea ten times a day in November 2016,[5] (R. 337-38), and periodic complaints of "diarrhea" upon review of symptoms, treatment records reveal that Claimant herself repeatedly reported that she was suffering from *no* debilitating Crohn's related symptoms – let alone frequent bathroom use – during the alleged period of disability, and even as recently as just six weeks before the hearing. (*See, e.g.,* R. 329 ("no problems" in February 2017); R. 325 (no "gi [symptoms]" in March 2017); R. 321 ("no [C]rohn's [symptoms]" in April 2017); R. 774 ("no gi symptoms on humira" in March 2019); and R. 770 (Crohn's symptoms "minimal . . . by and large" in July 2019)). The ALJ was within her purview when she explicitly considered such records, along with the "minimal/mild disease" seen on colonoscopy, and determined they "fail[ed] to substantiate the allegations of disabling systems." (R. 19).

---

[5] It was at this visit that Dr. Kirch increased Claimant's medication dosage, which ultimately proved effective.

Second, the only opinion evidence regarding bathroom breaks was that of Dr. Kirch, who opined that Claimant would require three to six bathroom breaks a day, lasting up to fifteen minutes at a time. (R. 766). But, again, *see supra* at Section III.A.1., the ALJ found Dr. Kirch's opinion – including that related to bathroom breaks – "unpersuasive" because it was "not consistent with the record or his own progress notes showing no gastro symptoms." (R. 20). Not only has Claimant declined to challenge this finding on appeal, but the ALJ's decision in this regard is well reasoned given the inconsistency between Dr. Kirch's restrictive opinion and his own contemporaneous records of Claimant's subjective reports. *See Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016) (finding that ALJ "properly discounted" treating physician's opinion "due to lack of consistency"); *Fair v. Saul*, 853 Fed.Appx. 17, 21 (7th Cir. 2021) (the ALJ properly discounted treating physician's opinion where his "own records did not support his conclusions."). Indeed, when explicitly asked to identify the "clinical findings and objective signs" of Claimant's impairments, Dr. Kirch responded: "clinical findings stable on Humira and 6-MP. Colonoscopy showed minimal disease," (R. 764), leaving his opinion bereft of objective support. *See* 20 C.F.R. §404.1520c ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be.").

Finally, while Claimant's own testimony *can* serve as a potential evidence of her frequent bathroom use, *see, e.g., Jacob D. v. Kijakazi*, No. 20-CV-0554, 2021 WL 3674610, at *3 (N.D.Ill. Aug. 19, 2021), the ALJ was not required to blindly accept such testimony here in light of the conflicting evidence of record, particularly Claimant's own repeated denials of GI symptoms to her treating physicians. *See Harris-Patterson v. Saul*, 835 Fed.Appx 130, 131 (7th Cir. 2021) (ALJ was not required to "accept Claimant's contention" at least with respect to the

frequency of bathroom breaks where "the record as a whole contains substantial contrary evidence."). Moreover, when confronted at the hearing to address *why* Dr. Kirch often documented "no changes in bowel habits," Claimant did not deny the accuracy of those records, but instead testified that Dr. Kirch was already aware of her diarrhea symptoms and that "nobody wants to discuss their bowel issues." (R. 54-55). But this explanation is unpersuasive because it: (1) contradicts Dr. Kirch's finding that she was "stable on Huira and 6-MP" at the time (R. 764); and (2) is undercut by records indicating that Claimant had no difficulty discussing her bowel issues with Dr. Kirch on other occasions. (*See, e.g.,* R. 337-38 (complaining of diarrhea ten times a day)).

In sum: the ALJ's decision not to include limitations related to bathroom breaks in the RFC was supported by substantial evidence in the record. *Shanta v. Kijakazi*, No. 621CV03249DGKSSA, 2022 WL 14485729, at *2 (W.D.Mo. Oct. 25, 2022) (finding no reversible error where the ALJ did not include bathroom breaks in the RFC because the medical records and opinions supported that conclusion).[6]

### 3. The ALJ's decision not to include finger limitations in the RFC was supported by substantial evidence.

Finally, citing primarily to her own testimony and to medical records reflecting tenderness and pain in her hands, Claimant argues that the ALJ erred by not including any

---

[6] In this regard, the Court distinguishes this case from those relied on by Claimant where the ALJ concluded that the record supported the need for bathroom breaks but then failed to properly include or assess any related limitations in the RFC. *See, e.g., Olisaemeka O. v. Saul*, No. 19 C 5766, 2021 WL 780717, at *4 (N.D.Ill. Mar. 1, 2021) (remanding where the "ALJ accepted evidence that Plaintiff needed at least eight unscheduled breaks per day" but failed to determine if those breaks would exceed the allowable threshold of off-task time); *Manker v. Berryhill*, No. 16 C 10704, 2017 WL 6569719, at *3 (N.D. Ill. Dec. 22, 2017) (remanding where the ALJ limited claimant to work "which would allow ready access to a restroom" but failed to consider the frequency and duration of bathroom breaks).

handling or fingering limitations in the RFC. Again, on the record before the Court, this argument is unpersuasive.

Claimant is indeed correct that an ALJ must "consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010). "Crucially, however, an ALJ need only include limitations that are supported by the medical record." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021) ("In an RFC assessment . . . , an ALJ must include all of a claimant's limitations supported by the medical record.").

Here, apart from one April 2016 ER record revealing a decreased range of motion and swelling of the left hand, Claimant has not pointed the Court to any objective medical findings that support hand limitations. On the contrary – while the record includes notations of joint tenderness and discomfort in her hands – Claimant's hand imaging was normal, (R. 395, 543-44), treating physician Dr. Hozman repeatedly documented full range of motion and strength, bilaterally (R. 756, 762), and examining agency physician Dr. Kogan observed full strength, and no limitations in fine manipulation or handling small objects, (R. 417).[7]

Where, as here, there is substantial evidence in the medical record that does not support any handling or fingering limitations, the ALJ did not err in omitting such limitations from the RFC even though the ALJ questioned the VE about the potential implications of manipulative limitations had they been supported by the record. *See Deborah M.*, 994 F.3d at 791 (concluding the ALJ properly omitted manipulative limitation from RFC because "[n]o doctor who addressed

---

[7] The Court notes that Dr. Kirch opined generally that Claimant would have "significant limitations with reaching, handling or fingering" during flare ups. But, again, the ALJ found Dr. Kirch's opinion "unpersuasive," a finding Claimant has not attacked on appeal.

Plaintiff's carpal tunnel syndrome ever deemed it a manipulative limitation"); *Michelle M. L. v. Kijakazi*, No. 20 C 6793, 2022 WL 3297619, at *5 (N.D.Ill. Aug. 11, 2022) ("[T]here were no occasional manipulative limitations supported by the medical record, and the ALJ was therefore not required to incorporate an occasional handling and fingering limitation into the RFC."); *see also Karla J.B.*, 2020 WL 3050220, at *5 ("Though Plaintiff correctly points out the VE's testimony that no jobs would be available for Plaintiff had the ALJ limited her to 'occasional' handling and fingering . . . she points to no evidence that this limitation was needed aside from her own testimony").

For all of the above reasons, the Court is satisfied that the ALJ "buil[t] an accurate and logical bridge from the evidence to her RFC determination. *Jarnutowski*, 48 F.4th at 774.

**B.      The ALJ's assessment of Claimant's subjective complaints was not patently wrong.**

In considering Claimant's allegations of disabling symptoms and limitations, the ALJ found as follows:

> [T]he claimant's receipt of conservative treatment, rather good objective diagnostic imaging and physical/mental status examination findings, as well as admitted activities of daily living all suggest that the claimant's impairments are not as severe as she alleged, and instead supports a conclusion that she remains capable of performing work within the restrictions set forth [in the RFC].

(R. 20).

It is well settled that any challenge to the ALJ's symptom evaluation faces a high hurdle, as the Court will not overturn the ALJ's credibility finding unless it is "patently wrong," meaning it lacks any explanation or support in the record. *Elder*, 529 F.3d 408, 413-14 (7th Cir. 2008). Despite this deferential standard, Claimant now argues that the ALJ committed three errors when assessing her subjective symptoms. Namely, she asserts that the ALJ: (1) improperly relied on her activities of daily living, including her childcare duties; (2) placed

improper weight on Claimant's minimal work following her alleged onset date of disability; and

(3) improperly relied on Claimant's conservative treatment history.[8]

### 1. The ALJ's consideration of Claimant's daily activities, including caring for her children, does not require reversal.

When considering Claimant's activities of daily living, the ALJ stated as follows:

> The claimant's admitted activities of daily living also suggest the claimant is not as limited as alleged and remains capable of performing work within the restrictions set forth herein. For example, she reported being capable of preparing meals, performing housework, cleaning, sweeping, doing dishes, watching television, caring for pets, caring for her children, driving, and shopping despite her symptoms.

> Notably, the ability to care for young children and pets can be quite demanding both physically and emotionally, without any particular assistance. These activities suggest a level of functioning and concentration inconsistent with the degree of pain alleged at the hearing.

(R. 19-20). Claimant now argues that the ALJ placed undue weight on her activities of daily living, including her ability to take care of her young children. Again, the Court disagrees.

While the Seventh Circuit has "cautioned" ALJs not to equate activities of daily living with "the rigorous demands of the workplace," *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (citations omitted), "it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated." *Id., quoting Loveless*, 810 F.3d at 508. Similarly, as Claimant notes, the Seventh Circuit has cautioned ALJs from placing undue weight on a claimant's ability to care for children, recognizing that a claimant may be doing so simply out of necessity. *Forsythe v. Colvin*, 813 F.3d 677, 679 (7th Cir. 2016) ("[S]heer necessity may compel one to perform tasks

---

[8] Claimant also very briefly argues that the ALJ failed to consider the side effects of Claimant's medications as required by SSR 16-3p. (Dckt. #18 at 14-15). However, although Claimant described medication side effects in an April 2018 function report – which the ALJ acknowledged – when questioned about side effects by the ALJ at the hearing, Claimant denied that any side effects were specifically linked to her medication. (R. 39-40).

at home no matter how painful, such as taking care of one's child."). Nonetheless, an ALJ may – and in fact must – consider all of the evidence in the record, including activities of daily living, in considering the veracity of Claimant's allegations of limitations. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("In determining credibility an ALJ must consider several factors, including the claimant's daily activities); *John P. v. Saul*, No. 2:19CV0004, 2019 WL 4072118, at *12 (N.D.Ind. Aug. 28, 2019) ("An ALJ must consider a claimant's activities of daily living when she assesses a claimant's subjective allegations.") (citing SSR 16-3p, 2017 WL 5180304, at *7).

That is precisely what the ALJ did here when she found Claimant's own description of her activities of daily living, including caring for her young children, to be inconsistent with her allegations of extremely disabling limitations. She did not equate those activities to full time work and, thus, the Court finds no error in her consideration of those activities.[9] *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) ("The ALJ did not equate Burmester's ability to perform certain activities of daily living with an ability to work full time. Instead, he used her reported activities to assess the credibility of her statements concerning the intensity, persistence, or limiting effects of her symptoms consistent with the applicable rules.").

---

[9] Claimant also argues that the ALJ ignored *how* she performed her daily activities; that is, on her own schedule when her symptoms are mild and with assistance from her fiancé or brother-in-law. But as the Commissioner argues, the ALJ gave Claimant the opportunity to explain what the ALJ viewed as inconsistencies between some of her prior reports – which implied she was a full-time caregiver without qualifications – and her hearing testimony, and she could offer no explanation. The ALJ was free to weigh that testimony, or rather lack thereof, as she saw appropriate. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (The court cannot "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner.").

### 2. The ALJ properly considered Claimant's work after the alleged onset date of disability.

When reviewing Claimant's subjective symptoms, the ALJ noted that her earnings record reflected earnings in the third and fourth quarters of 2016 after her alleged May 19, 2016 onset of disability. (R. 16 (citing R. 201)). The ALJ commented further:

> Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported.

(R. 20). Contrary to the Claimant's assertion, this finding does not require remand.

Although the Seventh Circuit has "cautioned ALJs not to draw conclusions about a claimant's ability to work full time based on part-time employment," *Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017) (citing cases), the ALJ made no such inference here. Instead, as the Commissioner correctly notes, the ALJ's consideration of Claimant's part-time work after her alleged onset of disability date was just one of several factors that the ALJ considered when determining the severity of Claimant's subjective symptoms and limitations. Such a consideration was well within the ALJ's purview. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("[T]he fact that [claimant] could perform some work cuts against his claim that he was totally disabled."); *Katrina C. v. Kijakazi*, No. 20 C 3902, 2022 WL 198807, at *3 (N.D.Ill. Jan. 21, 2022) ("[A]n ALJ may consider Plaintiff's prior work record and efforts to work in assessing subjective symptoms.") (internal quotation omitted); *Oak v. Kijakazi*, No. 22-CV-138-SLC, 2022 WL 17580595, at *7 (W.D.Wis. Dec. 12, 2022) (part-time work could reasonably suggest that claimant is not as limited as alleged).

3.    **The ALJ properly considered Claimant's conservative treatment history.**

Again, upon reviewing Claimant's medical history, which included successful medical management and minimal objective findings, the ALJ described Claimant's treatment as "conservative" when discrediting the severity of her subjective symptoms and limitations. The Court finds no reversible error in this regard.

As a general matter, "an ALJ is entitled to consider the routine and conservative nature of a claimant's treatment in assessing the claimant's credibility." *Annette S. v. Saul*, No. 19 C 6518, 2021 WL 1946342, at *12 (N.D.Ill. May 14, 2021) (citing *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009)); *Anthony G. v. Saul*, No. 17 CV 4393, 2020 WL 439964, at *10 (N.D.Ill. Jan. 28, 2020) ("[T]he Seventh Circuit has held that it is reasonable for an ALJ to consider a claimant's conservative treatment."); 20 C.F.R. § 404.1529(c)(3)(v). Although Claimant does not dispute this well-settled notion, she argues that whenever an ALJ relies on conservative treatment, she must explain what alternative, "aggressive" treatment would have been available and more appropriate. (Dckt. #18 at 15). Contrary to Claimant's assertion, however, courts have routinely deemed medication management – such as that reflected in Claimant's treatment record during the alleged period of disability here – to be a conservative course of treatment without requiring any further explanation or context. *See Similia*, 573 F.3d at 519 (affirming adverse credibility finding based on claimant's "relatively conservative" treatment of "various pain medications, several injections, and one physical therapy session"); *Calvin B. v. Kijakazi*, No. 20 C 3404, 2022 WL 3018313, at *7 (N.D.Ill. July 29, 2022) (noting that the "[r]eceipt of conservative treatment is a legitimate reason to find a claimant not entirely credible, and here, Plaintiff received only routine medication management") (citation omitted); *Darlene C. v. Saul*, No. 19-cv-5059, 2020 WL 6447641, at *7 (N.D.Ill. Nov. 3, 2020) (finding the ALJ properly considered

the claimant's "conservative treatment, which consisted of taking medications, wearing a cardioverter defibrillator and custom orthopedic shoes, and using foot ointment.").

Accordingly, an ALJ may properly discount a claimant's subjective complaints based on conservative treatment without theorizing what alternative procedures would be necessary were the condition more severe. *See Prill v. Kijakazi*, 23 F.4th 738, 749 (7th Cir. 2022) (finding that the ALJ properly considered the claimant's lack of major surgery when evaluating her subjective complaints). In fact, speculation by the ALJ as to what alternative course of treatment would have been better would constitute "playing doctor," which is impermissible. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) ("The ALJ impermissibly 'played doctor' and reached his own independent medical conclusion" concerning the level of treatment claimant should have received).

Moreover, since Claimant "repeatedly denied experiencing any symptoms at all, the ALJ reasonably concluded that [her] assertions of disabling [symptoms] were not credible regardless of any other treatment options." *Calvin B.*, 2022 WL 3018313, at *7. On this record, "the court will not substitute its judgment for that of the ALJ's as to what constitutes conservative treatment . . . especially where [the claimant] has not pointed to evidence undermining the ALJ's characterization of her treatment or explain[ed] why she did not seek other forms of treatment." *Regina P. v. Saul*, No. 19 CV 3155, 2020 WL 4349888, at *5 (N.D.Ill. July 29, 2020).

In sum, viewing the record as a whole, the ALJ "provided several valid reasons for rejecting [Claimant's] complaints of disabling limitations, and that decision was not patently wrong." *Alan C. v. Kijakazi*, No. 20 C 7757, 2023 WL 2915404, at *5 (N.D.Ill. Apr. 12, 2023); *Kittelson v. Astrue*, 362 Fed.Appx. 553, 557 (7th Cir. 2010) ("The ALJ's adverse credibility finding was not perfect. But it was also not 'patently wrong.'").

### CONCLUSION

For the foregoing reason, Claimant's motion to reverse the Commissioner's decision to deny her DIBs and SSI, (Dckt. #18), is denied, and the Commissioner's motion for summary judgment, (Dckt. #25), is granted. The decision of the ALJ is affirmed.


**DATE:**        **May 12, 2023**


**Jeffrey I. Cummings**
**United States Magistrate Judge**

27